**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILINOIS**

| | |
|---|---|
| GWENDOLYN CROCKRAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANS UNION LLC,<br><br>Defendant. | Case No.______________________ |

**CLASS ACTION COMPLAINT**

Plaintiff Gwendolyn Crockran ("Plaintiff Crockran"), on behalf of herself and all others similarly situated ("Class Members" or "the Class"), by and through her undersigned counsel, brings this action against Trans Union LLC ("TransUnion" or "Defendant") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## I. SUMMARY OF THE ACTION

1. Plaintiff brings this class action against Defendant TransUnion for its failure to secure and safeguard consumers' personally identifiable information ("PII") which TransUnion collected in connection with the operation of its business as a consumer credit reporting agency, and for failing to provide timely, accurate and adequate notice to Plaintiff and other Class Members that their PII had been unlawfully accessed and precisely what types of information were stolen.

2. TransUnion informed the attorneys general in several states on or about August 27,

2025, that on July 28, 2025, it had fallen victim to a cybersecurity attack.[1] During this attack, cybercriminals unlawfully accessed the highly sensitive, confidential, and personal information of over four million TransUnion customers. In a filing with the Texas Attorney General's office, TransUnion acknowledged that this data breach (the "Data Breach") exposed and enabled hackers to access the following PII of TransUnion customers: names, Social Security Numbers ("SSN"), and dates of birth.[2]

3. Despite identifying the Data Breach internally as early as July 28, 2025, Defendant waited approximately one month before it began notifying consumers that the Data Breach had occurred and that the sensitive PII of 4,461,511 consumers was exposed.

4. The PII of Plaintiff and the Class of consumers she seeks to represent was compromised due to TransUnion's acts and omissions and its failure to properly protect and safeguard the PII.

5. TransUnion could have prevented this Data Breach. Similar Data Breaches have occurred at other companies, including its major competitors, Experian and Equifax.

6. The Data Breach was the inevitable result of TransUnion's inadequate approach to data security and the protection of the PII that it collected during the course of its business.

7. TransUnion disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected, failing to disclose to its customers the material fact that it did not

[1] Office of the Maine AG: Consumer Protection: Privacy, Identity Theft and Data Security Breaches, *Data breach notifications*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Sept. 29, 2025).

[2] Office of the Texas AG, *Data Security Breach Reports*, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Sept. 29, 2025).

have adequate computer systems and security practices to safeguard PII, failing to take available steps to prevent and stop the breach from occurring, and failing to monitor and detect the breach on a timely basis.

8. Through this Complaint, Plaintiff seeks to redress the injuries related to the Data Breach on behalf of herself and all similarly situated individuals whose PII was unlawfully accessed and stolen during the Data Breach.

9. Plaintiff and Class Members have a continuing interest in ensuring that their Private Information is properly safeguarded, and they should be entitled to injunctive and other equitable relief.

## II. PARTIES

10. Plaintiff Gwendolyn Crockran is a resident and citizen of the State of Illinois, County of Cook. Plaintiff learned of the Data Breach through a Notice of Data Incident letter sent to her by TransUnion on or about September 15, 2025. Ex. A, Notice of Data Incident.

11. Defendant Trans Union LLC is a consumer reporting agency organized under the laws of the State of Delaware with its principal place of business located at 555 W. Adams Street Chicago, Illinois. At all times relevant to this Complaint, Trans Union LLC has been a "nationwide consumer reporting agency" (NRCA). 15 U.S.C. § 1681a(p); 12 C.F.R. § 1022.130(h). Trans Union LLC compiles and maintains financial, consumer, and commercial data from across the nation and worldwide. Trans Union LLC sells and provides consumer reports to commercial users, such as lenders, insurance companies, and potential employers.

12. Upon information and belief, the members of Trans Union LLC include individuals serving on its Board of Directors. Among them is Christopher A. Cartwright, the President and Chief Executive Officer of Trans Union LLC, who, along with other members, has listed addresses

in Chicago, Illinois. Accordingly, based on its principal place of business being located in Chicago, Illinois, and the residence of certain LLC members in the same state, Trans Union LLC is, upon information and belief, a citizen of the State of Illinois.

## III. JURISDICTION AND VENUE

13. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because the matter in controversy, exclusive of interest and costs, exceeds the sum value of $5,000,000.00, involves more than 100 class members, and given that Trans Union LLC is a nationwide credit reporting agency with millions of United States consumers enrolled in its credit monitoring services, many Class Members are citizens of different states than Defendant.

14. This Court has personal jurisdiction over Defendant because it is headquartered in and has its principal place of business in Chicago, Illinois.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is in this District and therefore Defendant resides in this District pursuant to 28 U.S.C. § 1391(c)(2). Venue is further proper in this District under § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Class' claims also occurred in this District.

## IV. FACTUAL ALLEGATIONS

***Defendant Acquires, Collects, and Maintains Plaintiff's and Class Members' Private Information***

16. Defendant is one of the three largest credit bureaus in the United States.[3] It collects,

[3] The Investopedia Team, *Top 3 Credit Bureaus: How They Work and What They Know About You*, https://www.investopedia.com/personal-finance/top-three-credit-bureaus/ (last visited Sept. 29, 2025).

stores and maintains a database of information from more than 260 million adults in the United States.[4] These companies are supplied with data about loans, loan payments and credit cards, as well as information such as child support payments, credit limits, missed rent and utilities payments, addresses and employer history. All of this information and more factors into credit scores.

17. Unlike other data breaches, not all of the people affected by the TransUnion Data Breach may be aware that they are customers of the company. TransUnion receives data from credit card companies, banks, retailers, and lenders who report on the credit activity of individuals to credit reporting agencies, as well as by purchasing public records.

18. TransUnion is a regulated consumer reporting agency under the Fair Credit Reporting Act ("FCRA"). In connection with its work as a credit reporting agency, Defendant collects, stores, processes, and maintains sensitive personal data for millions of individuals throughout the United States. In doing so, TransUnion retains sensitive personal information including, but not limited to, names, addresses, Social Security Numbers, and financial account information.

19. As part of its regular course of business, current and former customers of Defendant's services, including Plaintiff and Class Members, many class members were required by Defendant to provide their highly sensitive PII to Defendant and/or class members' information is provided to Defendant as part of class members' credit transactions run through Defendant..

[4] TransUnion Blog, *Credit Data for Economic and Population Research,* https://www.transunion.com/blog/credit-data-economic-population-research#:~:text=Credit%20data%20is%20reported%20to,the%20Credit%20Data%20Industry%20Association (Oct. 1, 2024).

20. TransUnion uses Salesforce Inc., a third-party application.[5]

21. Salesforce is a cloud-based software company that provides services to a range of corporate clients, including but not limited to TransUnion.

22. Upon information and belief, as part of its regular course of business, Defendant maintained and stored Plaintiff's and Class Members' PII on its systems and/or allowed their PII to be maintained on Salesforce's systems.

23. Upon information and belief, while collecting the PII from Plaintiff and Class Members, Defendant promised to provide confidentiality and adequate security for the data that it collected from them through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

24. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

25. Indeed, Defendant represents that it takes cybersecurity seriously, stating that "[w]e maintain a comprehensive information security program with administrative (policies, standards, and processes), physical, and technical controls designed to protect the confidentiality, integrity, and accessibility of personal information."[6]

26. Furthermore, Defendant has made representations regarding the third-party vendors

---

[5] BleepingComputer, *TransUnion Suffers data breach impacting over 4.4 million people*, https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/ (Aug. 28, 2025).

[6] TransUnion, *TransUnion LLC Privacy Notice*, https://www.transunion.com/privacy/transunion#:~:text=An%20individual's%20age%20(40%20years,Small/personally%2Downed%20business%20data (last modified Aug. 8, 2025).

that it utilizes, stating the following:[7]

> Our security ecosystem includes the use of third parties, suppliers and vendors who are carefully selected to support our risk goals. Our Third-Party Risk Management program sets requirements and guidelines for third-party vendors, suppliers and partners, using an Enterprise Security Ratings Platform to gather terabytes of data from security sensors around the world, and providing insights concerning potential risks. Each third-party company receives a security rating based on the severity, frequency and duration of security incidents.

27. In its Privacy Policy, Defendant acknowledges that its credit database is subject to the FCRA and represents that access to the database is restricted to: (i) entities with a permissible purpose under the FCRA; (ii) entities authorized under Title V of the Gramm–Leach–Bliley Act; (iii) companies legally permitted to resell data; and (iv) companies that process data on Defendant's behalf.[8]

28. Plaintiff and Class Members relied on these promises and on Defendant to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

29. Yet, contrary to Defendant's representations, Defendant failed to protect Plaintiff's and Class Members' PII and failed to implement adequate data security measures as evidenced by Defendant's admission of the Data Breach, which affected, to date, approximately 4,461,511.

***The Data Breach and Defendant's Failure to Adequately Disclose Same***

30. On or around July 28, 2025, Defendant became aware that it had fallen victim to a cybersecurity attack involving unauthorized access to customer data stored on a third-party

---

[7] TransUnion, *Data Security*, https://www.transunion.com/client-support/data-security (last visited Sept. 29, 2025).

[8] *Id.*

application.[9] Following an investigation, Defendant confirmed that an unauthorized actor had accessed, viewed, and/or stolen PII belonging to its customers that was stored on systems operated by Salesforce—a third-party vendor used by TransUnion.

31. The Data Breach originated from a cyberattack on Salesforce's systems, which were compromised after cybercriminals first infiltrated the GitHub account of Salesloft, a third-party sales engagement platform, in March 2025.[10] Salesloft's Drift platform, which integrates with Salesforce, was exploited during the attack. The cybercriminals stole OAuth tokens from Drift, which were then used to access sensitive data stored within Salesforce's environment—including data maintained by TransUnion.

32. Despite identifying the breach on July 28, 2025, Defendant did not provide notice letters to affected individuals or begin to file notices with state attorneys general offices until August 27, 2025.

33. The notice letter Defendant submitted to the Maine Attorney General on August 27, 2025, offered only vague and cursory details regarding the breach. It stated merely that Defendant had "recently experienced a cyber incident involving a third-party application serving our U.S. consumer support operations. The unauthorized access includes some limited personal information belonging to you. We regret any concern caused by this incident and take seriously the responsibility to help secure consumer information … ."[11]

---

[9] Fox News, *TransUnion becomes latest victim in major wave of Salesforce-linked cyberattacks, 4.4M Americans affected*, https://www.foxnews.com/tech/transunion-becomes-latest-victim-major-wave-salesforce-linked-cyberattacks-4-4m-americans-affected (Aug. 31, 2025).

[10] BleepingComputer, *Salesloft: March GitHub repo breach led to Salesforce data theft attacks*, https://www.bleepingcomputer.com/news/security/salesloft-march-github-repo-breach-led-to-salesforce-data-theft-attacks/ (Sept. 8, 2025).

[11] *Id.*

34. Defendant's notice letter filed with the Attorney General of Maine failed to provide Plaintiff and Class Members basic details concerning the Data Breach, including the types of information that was accessed, which third-party application was impacted, how the cybercriminals accessed Defendant's networks, whether the data accessed was encrypted or otherwise protected, how and why the Defendant did not learn of the Data Breach until after it had concluded, and whether servers storing the information were also accessed.

35. The notices sent to the Plaintiff regarding the Data Breach—and, upon information and belief, to other Class Members—suffered from some or all of the same deficiencies as those provided to the Maine Attorney General's Office.

36. It was not until the following day, August 28, 2025, that TransUnion reported to the Texas Attorney General's Office, the specific types of information accessed during the Data Breach.[12] Included in the accessed files was a treasure trove of personal data: names, Social Security Numbers ("SSN"), and dates of birth. However, reports on the breach suggest that additional information, such as billing addresses, phone numbers, and email addresses, was also compromised.[13]

37. The Data Breach occurred because Defendant did not implement adequate and reasonable cyber-security procedures and protocols to protect the PII of Plaintiff and Class Members. Because Defendant's data security protocols and practices were deficient, unauthorized person(s) were able to access, view, and/or exfiltrate Plaintiff's and Class Members' PII.

---

[12] Office of the Texas AG, *Data Security Breach Reports*, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Sept. 29, 2025).

[13] BleepingComputer, *TransUnion Suffers data breach impacting over 4.4 million people*, https://www.bleepingcomputer.com/news/security/transunion-suffers-data-breach-impacting-over-44-million-people/ (Aug. 28, 2025).

38. Plaintiff further believes that her PII and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

***Defendant's Data Breach Was Imminently Foreseeable and Preventable***

39. Despite the growing body of publicly available information regarding the rise of cyberattacks that compromise PII and other forms of sensitive private information, Defendant's approach to maintaining the privacy of Plaintiff's and Class Members' PII was inadequate, unreasonable, negligent, and reckless. This is evidenced by Defendant's acknowledgment that it will "continue to enhance our security controls as appropriate to minimize the risk of any similar incident in the future."[14]

40. It is well known that PII, including Social Security numbers, are valuable commodities and a frequent, intentional target of cybercriminals. Companies that collect such information, including Defendant, are or should be well aware of the risk of being targeted by cybercriminals.

41. In fact, Defendant has ample reason to be aware of the vulnerabilities in its data security systems, having reported three separate cybersecurity incidents to the Maine Attorney General's Office in just the past three years.

42. Moreover, as one of the three largest credit bureaus in the United States, Defendant knew, or should have known, of the heightened risk it faced by virtue of the vast amount of consumer PII it maintains. Indeed, in 2017, another of the nation's three largest credit bureaus,

---

[14] Office of the Maine AG: Consumer Protection: Privacy, Identity Theft and Data Security Breaches, *Data breach notifications*, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited Sept. 29, 2025).

Equifax, suffered a massive data breach affecting approximately 143 million U.S. consumers. This breach, suffered by one of Defendant's main competitors, is "often considered one of the most significant and devastating cybersecurity incidents in history."[15]

43. Notably, TransUnion knew or should have known about the growing risk of third-party data breaches, especially after Google's Threat Intelligence Group warned in June 2025 that threat actor UNC6040 was targeting Salesforce customers through sophisticated social engineering attacks.[16] Despite these warnings and its reliance on Salesforce to store consumer data, TransUnion failed to take reasonable and adequate steps to ensure the security of the personal information it maintained through its third-party vendors.

44. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the United States Government:

- **Implement an awareness and training program:** Educate employees and individuals about the threat of ransomware and how it is delivered, as end users are often the primary targets.

- **Enable strong spam filters:** Prevent phishing emails from reaching end users by using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to block email spoofing.

- **Scan all incoming and outgoing emails:** Detect threats by scanning emails and filtering executable files to prevent them from reaching end users.

---

[15] Breachsense, *Equifax Data Breach Explained*: *A Case Study*, https://www.breachsense.com/blog/equifax-data-breach/#:~:text=What%20were%20the%20key%20impacts,resulting%20in%20substantial%20legal%20settlements (Dec. 8, 2024).

[16] BleepingComputer, *ShinyHunters behind Salesforce data theft attacks at Qantas, Allianz Life, and LVMH*, https://www.bleepingcomputer.com/news/security/shinyhunters-behind-salesforce-data-theft-attacks-at-qantas-allianz-life-and-lvmh/ (July 30, 2025).

- **Configure firewalls:** Block access to known malicious IP addresses to prevent unauthorized access.

- **Patch operating systems, software, and firmware:** Regularly update and patch devices, potentially using a centralized patch management system for greater efficiency.

- **Set anti-virus and anti-malware programs for regular scans:** Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage privileged accounts based on the principle of least privilege:** Limit administrative access to users only when absolutely necessary, and ensure those with admin privileges use them only when required. Implement an awareness and training program.

- **Configure access controls:** Implement least privilege principles for file, directory, and network share permissions. Users should only have access to what they need—if a user only needs to read specific files, they should not have write access to those files, directories, or shares.

- **Disable macro scripts in office files transmitted via email:** Prevent the execution of potentially harmful macros by disabling them in office files sent via email. Consider using Office Viewer software instead of full office suite applications to open email attachments.

- **Implement Software Restriction Policies (SRP):** Use SRPs or similar controls to prevent programs from executing from common ransomware locations, such as temporary folders associated with web browsers or compression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop Protocol (RDP):** If RDP is not in use, consider disabling it to reduce potential attack vectors.

- **Use application whitelisting:** Allow only programs that are explicitly permitted by security policy to execute, blocking any unauthorized or potentially malicious software.

- **Execute operating system environments or specific programs in a virtualized environment:** Run sensitive systems or programs in isolated virtual environments to reduce risk.

- **Categorize data based on organizational value:** Implement physical and logical separation of networks and data for different organizational units to protect critical information and ensure appropriate access control.[17]

45. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the Federal Trade Commission ("FTC") in its latest update to *Protecting Personal Information: A Guide for Business*:

- Know what personal information you have in your files and on your computers.
- Keep only what you need for your business.
- Protect the information that you keep.
- Properly dispose of information you no longer need.
- Create a plan to respond to security incidents.[18]

46. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendant could and should have implemented the following preventive measures, as recommended by the Joint Ransomware Task Force's ("JRTF") #StopRansomware Guide, although this list does not encompass the full range of recommended actions:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

[17] *How to Protect Your Networks from Ransomware: Technical Guidance Document*, https://www.justice.gov/criminal/criminal-ccips/file/872771/dl#:~:text=The%20U.S.%20Government%20(USG)% 20recommends,and%20Conformance%20(DMARC)%2C%20and (last visited Sept. 29, 2025).

[18] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sept. 29, 2025).

- **Regularly patch and update software and operating systems to the latest available versions.** Prioritize timely patching of internet-facing servers-that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled**. For example, disable ports and protocols that are not being used for business purposes.[19]

47. As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

48. Despite widespread reports of data breaches, Defendant neglected to implement the necessary safeguards to ensure the PII of Plaintiff and Class Members was protected.

49. Defendant was, or should have been, fully aware of the unique types and the significant volume of data in its systems, amounting to potentially millions of individuals' PII, and, thus, the significant number of individuals who would be harmed by the exposure of this data.

50. Given that Defendant was storing the PII it required Plaintiff and Class Members to provide, Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

51. The occurrence of the Data Breach indicates that Defendant failed to implement

---

[19] Cybersecurity & Infrastructure Security Agency, *#StopRansomware Guide*, https://www.cisa.gov/resources-tools/resources/stopransomware-guide (Oct. 19, 2023).

one or more of the above measures to prevent cybersecurity attacks. The failure to implement some or all of the above measures resulted in the Data Breach and the exposure of over four million Class Members' PII.

***Plaintiff's and Class Members' Private Information Has Significant Value***

52. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

53. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[22]

54. Upon information and belief, the data compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

---

[20] 17 C.F.R. § 248.201 (2013).

[21] *Id.*

[22] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs,* DIGITAL TRENDS, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs (Oct. 16, 2019).

55. For example, the process of replacing a Social Security Number is both time consuming and difficult. According to the Social Security Administration, if your SSN is lost or stolen but there is no evidence of misuse, you cannot obtain a new number. This leaves victims in a precarious situation, essentially forced to wait for fraud to occur before they can take action to mitigate the damage. This delay in being able to change a compromised SSN puts victims at continued risk for identity theft, financial fraud, and other forms of exploitation, making it much harder to protect themselves in the aftermath of a data breach.[23]

56. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

57. Plaintiff and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

***Defendant Failed to Comply with FTC Guidelines***

58. Defendant was also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. § 45), from engaging in "unfair or deceptive acts or practices in or affecting commerce."

---

[23] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Sept. 29, 2025).

[24] Government Accountability Office, *Report to Congressional Requesters*, https://www.gao.gov/assets/gao-07-737.pdf (June 2007).

The FTC has determined that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

59. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

60. For example, in 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines advise businesses, *inter alia*, to protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[25]

61. The guidelines further advise businesses: not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; to watch for large amounts of data being transmitted from the system; and to verify that third-party service providers have implemented reasonable security measures.[26]

62. To underscore the binding significance and legal ramifications of the promulgated

---

[25] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, Federal Trade Commission* (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Sept. 29, 2025).
[26] *Id.*

guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of FTCA, 15 U.S.C. § 45.[27] Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices.

64. Upon information and belief, Defendant was at all times fully aware of its obligations to protect the PII of Plaintiff and Class Members, and Defendant was also aware of the significant repercussions that would result from its failure to do so.

65. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII, or to comply with applicable industry standards, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Common Injuries & Damages***

66. As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and

---

[27] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) (determining that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act).

opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) nominal damages; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

67. The ramifications of Defendant's failure to safeguard the PII of Plaintiff and Class Members are long-lasting and severe. In 2023 alone, American adults lost $43 billion to identity theft.[28] Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

***Plaintiff Crockran's Experience***

68. At the time of the Data Breach, Plaintiff's and Class Members' PII, including their names, SSN's and dates of birth, were in the possession, custody and/or control of TransUnion. Plaintiff believed that TransUnion would protect and keep her PII protected, secured and safe from unlawful disclosure.

69. On information and belief, Plaintiff Crockran's PII was compromised in the Data Breach and stolen by cybercriminals who illegally accessed a third-party application utilized by Defendant for the purpose of specifically targeting PII.

70. After the Data Breach, Plaintiff received notice from TransUnion dated September 15, 2025, informing her that her PII was included in the Data Breach.

71. Plaintiff Crockran is very careful about sharing her sensitive PII.

[28] AARP, *Identity Fraud Cost Americans $43 Billion in 2023*, https://www.aarp.org/money/scams-fraud/identity-fraud-report-2024/ (Apr. 10, 2024).

72. Plaintiff Crockran stores any documents containing her sensitive PII in a safe and secure location. Plaintiff Crockran has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

73. Because of the Data Breach, Plaintiff Crockran's information is now in the hands of cybercriminals.

74. Plaintiff Crockran has suffered actual injury from the exposure and theft of her PII—which violates her right to privacy.

75. As a result of the Data Breach, which exposed highly valuable information such as her SSN, Plaintiff Crockran is now imminently at risk of crippling future identity theft and fraud.

76. As a result of the Data Breach, Plaintiff Crockran has had no choice but to spend numerous hours attempting to mitigate the harms caused by the Data Breach and addressing the future consequences of the Data Breach. Among other things, Plaintiff Crockran has already expended time and suffered loss of productivity from taking time to address and attempt to ameliorate and mitigate the future consequences of the Data Breach, including researching facts about the Data Breach, thoroughly reviewing her account statements and other information and taking other protective and ameliorative steps in response to the Data Breach. Plaintiff Crockran would not have had to engage in these time-intensive efforts but for the Data Breach.

77. As a result of the Data Breach, Plaintiff Crockran has experienced stress, anxiety and concern due to the loss of her privacy and concern over the impact of cybercriminals accessing and misusing her PII. In particular, Plaintiff Crockran is worried about her PII being placed on the dark web and fears that criminals will use this information to commit identity theft that causes her financial harm.

78. Following the Data Breach, Plaintiff Crockran experienced a significant increase in

spam emails and phone calls, many of which involved debt collection and credit repair companies. These communications appear to be targeted attempts by malicious actors to extract further PII, such as billing or payment details, reinforcing Plaintiff's concerns that her information was exposed on the dark web as a result of the Data Breach.

79. Plaintiff Crockran anticipates spending considerable time and money on an ongoing basis to remedy the harms caused by the Data Breach.

80. Plaintiff Crockran has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Crockran's valuable PII; (b) the imminent and certainly impending injury flowing from fraud and identity theft posed by her PII being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Crockran's PII that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff, including the difference in value between what Plaintiff should have received from Defendant and Defendant's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security to protect Plaintiff Crockran's PII; and (e) continued risk to Plaintiff Crockran's PII, which remains in the possession of Defendant and which is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Defendant.

## V. <u>CLASS ALLEGATIONS</u>

81. Plaintiff brings all claims as class claims under Federal Rule of Civil Procedure 23. The nationwide class is defined as follows:

> All persons residing in the United States whose PII was compromised as a result of the Data Breach, including persons who received a breach notification letter from Defendant (the "Class").

82. Excluded from the Class are Defendant and its officers, directors and employees;

any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendant. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

83. Plaintiff reserves the right to modify and/or amend the Class, including, but not limited to, creating additional subclasses as necessary.

84. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

85. All Class Members are readily ascertainable in that Defendant has access to addresses and other contact information for all Class Members, which can be used for providing notice to Class Members.

86. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

87. ***Numerosity.*** The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class includes over four million individuals who have been damaged by Defendant's conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records. Reportedly, the Data Breach has affected at least 4,461,511 individuals.

88. **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class Member because Plaintiff and each member of the Class had their sensitive PII

compromised in the same way by the same conduct of Defendant.

89. **Adequacy:** Plaintiff is an adequate representatives of the Class because Plaintiff's interests do not conflict with the interests of the Class that Plaintiff seeks to represent; Plaintiff has retained counsel competent and highly experienced in data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

90. **Superiority:** A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult, if not impossible, for members of the Class individually to effectively redress Defendant's wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

91. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant violated the FTCA;

c. Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

d. Whether Defendant had duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

e. Whether Defendant failed to adequately safeguard Plaintiff's and the Class' PII ;

f. Whether and when Defendant actually learned of the Data Breach;

g. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

h. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

i. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

j. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

k. Whether Plaintiff and Class Members are entitled to actual damages and/or nominal damages as a result of Defendant's wrongful conduct; and

l. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

92. Class certification is also appropriate because Defendant, through its uniform conduct, acted or failed and refused to act on grounds generally applicable to Plaintiff and the Class as a whole, making injunctive and declaratory relief appropriate to Plaintiff and the Class as a whole. Moreover, Defendant continues to maintain its inadequate security practices, retain

possession of Plaintiff's and Class Members' Private Information, and has not been forced to change its practices or to relinquish PII by nature of other civil suits or government enforcement actions, thus making injunctive relief a live issue and appropriate to the Class as a whole.

93. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names and addresses and/or email addresses of Class Members affected by the Data Breach, as is evident by Defendant's ability to send those individuals notices about the Data Breach.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE AND NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

94. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 93, as if fully set forth herein.

95. Defendant collected, stored, and maintained the PII of Plaintiff and Class Members as part of the regular course of its business operations, which services affect commerce.

96. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

97. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

98. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duties included a responsibility to implement processes by

which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

99. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

100. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII stored within it.

101. Defendant's duty to implement reasonable security measures stems from common law, as well as regulations under the FTCA both of which require Defendant to use appropriate cybersecurity measures.

102. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of engaging with Defendant, and because Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

103. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

104. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

105. Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

106. Defendant breached its duties, pursuant to the FTCA and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;
- Failing to adequately monitor the security of its networks and systems;
- Allowing unauthorized access to Class Members' PII;
- Failing to detect in a timely manner that Class Members' PII had been compromised;
- Failing to remove the PII of individuals it formerly engaged with when it was no longer required to retain that information pursuant to regulations; and
- Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate action to mitigate the potential for identity theft and other damages.

107. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

108. Plaintiff and Class Members were within the class of persons the FTCA was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

109. Defendant's violation of the FTCA also constitutes negligence *per se*, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches.

110. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

111. Defendant has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

112. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

113. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

114. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in Defendant's industry.

115. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing

adequate security of that PII, and the necessity for encrypting Private Information stored on Defendant's systems or transmitted through third party systems.

116. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

117. Plaintiff and the Class had no ability to protect their PII that was in, and is believed to remain in, Defendant's possession.

118. Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

119. Neither Plaintiff nor Class Members contributed to the Data Breach and subsequent misuse of their PII as described in this Complaint.

120. But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

121. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

122. As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii)

statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their PII.

123. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

124. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

125. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 124, as if fully set forth herein.

126. Plaintiff and Class members conferred a monetary benefit on Defendant by providing them with their valuable PII.

127. Defendant knew that Plaintiff and Class Members conferred a benefit upon it and had accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' retained data and used Plaintiff's and Class Members' PII for business purposes.

128. Upon information and belief, Defendant funds any data security measures it implements entirely from its general revenues, including from money it makes based upon representations of protecting Plaintiff's and Class Members' PII which has monetary value.

129. Thus, there is a direct nexus between the monetary benefit conferred upon Defendant and the requirement that Defendant keep Plaintiff's and Class Members' PII confidential and protected.

130. Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

131. Defendant acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

132. If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have entrusted their PII to Defendant or otherwise engaged with Defendant.

133. Plaintiff and Class Members have no adequate remedy at law.

134. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their PII.

135. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

136. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy;

(ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their PII.

137. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

138. Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Class)

139. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 138, as if fully set forth herein.

140. Defendant collected, stored, and maintained the PII of Plaintiff and the Class.

141. Plaintiff and Class Members provided their PII to Defendant in the ordinary course

of Defendant's business as a requirement to engage with Defendant. Plaintiff and Class Members paid money to Defendant in exchange for Defendant's services and would not have paid for Defendant's products or services, or would have paid less for them, had they known that Defendant's data security practices were substandard.

142. Defendant solicited, offered, invited, and required Class Members to provide their PII as part of Defendant's regular business practices. Per Defendant's requirements, Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

143. Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

144. Defendant accepted possession of Plaintiff's and Class Members' PII for the purpose of engaging with Plaintiff and Class Members to enhance and further their business.

145. When Plaintiff and Class Members provided their PII to Defendant for the purpose of receiving services from Defendant, they entered into implied contracts with Defendant.

146. Plaintiff and the Class Members thus entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect their PII, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

147. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations (including FTC guidelines on data security) and were consistent with industry standards.

148. Implicit in the agreement between Plaintiff and Class Members and Defendant to provide Private Information was Defendant's obligation to: (a) use such PII for business purposes

only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

149. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

150. On information and belief, at all relevant times Defendant promulgated, adopted, and implemented a written privacy policy whereby it expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relates to the Data Breach.

151. On information and belief, Defendant further impliedly promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

152. Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of their earnings to obtain adequate data security. Defendant failed to do so.

153. Plaintiff and Class Members would not have entrusted their PII to Defendant or otherwise have engaged with Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

154. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

155. Every contract in this State has an implied covenant of good faith and fair dealing, which is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

156. Plaintiff and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

157. Defendant breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their PII, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

158. Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PII, failing to timely and accurately disclose the Data Breach to Plaintiff and Class Members and continued acceptance of PII and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

159. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to

further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

160. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

161. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT IV**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

162. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 161, as if fully set forth herein.

163. Plaintiff and Class Members had a reasonable expectation that Defendant would maintain the privacy of the PII collected and maintained by Defendant.

164. Defendant represented to Plaintiff and Class Members that it would not disclose their PII except in a handful of clearly defined and disclosed circumstances not applicable to the Data Breach.

165. Despite representations to the contrary, Defendant failed to protect and safeguard the PII entrusted to it by Plaintiff and Class Members and in so doing intruded on the private and personal affairs of Plaintiff and Class Members in a manner highly offensive to a reasonable person; invaded the privacy of Plaintiff and Class Members by disclosing, without authorization, the PII of Plaintiff and Class Members, inconsistent with both the purpose of the collection of the PII and inconsistent with the uses of said PII previously disclosed to Plaintiff and Class Members;

failed to provide sufficient security to protect the PII of Plaintiff and Class Members from unauthorized access; and enabled, by failing to protect it sufficiently, the disclosure of PII without the consent of Plaintiff or Class Members.

166. Defendant knew, or acted with reckless disregard in not knowing, that the PII collected from Plaintiff and Class Members was, because of its nature, subject to a significant risk of unauthorized access.

167. Defendant knew, or acted with reckless disregard in not knowing, that a reasonable person would consider its failure to adequately protect and secure their PII to be highly offensive.

168. Defendant's disclosure of Plaintiff's and Class Members' PII without their consent constituted a violation of the privacy of Plaintiff and Class Members.

169. Defendant's failure to provide sufficient security to protect the PII of Plaintiff and Class Members, leading to unauthorized access to that data by unauthorized parties, constituted the unlawful publication of that PII by Defendant.

170. The PII disclosed in the Data Breach was not generally known to the public and is not a matter of legitimate public concern.

171. Plaintiff and Class Members had a reasonable expectation of the privacy of the PII that they provided to Defendant. That reasonable expectation was thwarted by Defendant's actions and inactions and Defendant's conduct constituted an invasion of Plaintiff's and Class Members' privacy.

172. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial as well as restitution and injunctive relief.

173. As a direct and proximate consequence of Defendant's invasion of privacy by

intrusion, Plaintiff and Class Members have suffered the injuries alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a. For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

b. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

c. For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiff's and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to

identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

d. For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

e. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. For prejudgment interest on all amounts awarded; and

g. Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: September 30, 2025

Respectfully submitted,

/s/ *Kenneth A. Wexler*

Kenneth A.Wexler
Justin N. Boley
Zoran Tasic
Andrew J. Grant
**WEXLER BOLEY & ELGERSMA LLP**
311 S.Wacker Drive, Suite 5450
Chicago, Illinois, 60606
Tel: (312) 346-2222
kaw@wbe-llp.com
jnb@wbe-llp.com
zt@wbe-llp.com
ajg@wbe-llp.com

Lori G. Feldman, Esq.
**GEORGE FELDMAN MCDONALD, PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, New York 10520
Telephone: (917) 983-9321
lfeldman@4-justice.com
eservice@4-justice.com

Janine L. Pollack, Esq.
**GEORGE FELDMAN MCDONALD, PLLC**
745 5th Avenue, Suite 500
New York, NY 10151
Phone: (917) 983-2707
Fax: (888) 421-4173
Email: jpollack@4-justice.com
Email: eservice@4-justice.com

*Attorneys for Plaintiff and the Putative Class*